ZACHARY, Judge.
 

 *517
 
 Defendant Todd Eric Boderick appeals from the denial of his motion to dismiss and from judgments entered upon his convictions for first-degree murder and felony child abuse following a bench trial. After a thorough review of the record and applicable law, we vacate and remand for a new trial.
 

 I. Factual and Procedural Background
 

 Defendant and Krishay Mouzon ("the mother") had a daughter ("the child") born on 25 April 2012. Defendant and the mother had custody of the child, and the mother had two additional children of whom she did not have custody. Defendant and the mother lived with the child in various hotels.
 

 On 27 October 2012 at approximately 9:27 p.m., police and the fire department responded to a call at the hotel where defendant, the mother, and the child were living. The emergency responders found the child, who was then six-months old, unresponsive. The child was rushed to the hospital and pronounced dead shortly thereafter. Defendant was charged with murder on 13 November 2012.
 

 Medical examiner Thomas Owens, M.D. performed the child's autopsy and testified as the State's expert in the field of forensic pathology at defendant's trial. Dr. Owens opined that the child died from severe brain injury and bleeding that was caused by non-accidental "blunt-force head trauma [.]" According to Dr. Owens, the pattern of injury and bleeding "indicate[d] ... global-type activity[,] ... the whole head or the body being violently moved or shaken back and forth. As opposed to, if there was a fall or a single impact in just one little spot[.]"
 

 *891
 
 Dr. Owens testified that the child's time of death was 10:13 p.m. on 27 October 2012, and that in his opinion, the fatal injuries looked recent, probably having been inflicted "anywhere from a couple of hours to as much as maybe a day" before the child's death. He also found indications of prior brain trauma in the child that had likely occurred "a couple of weeks" ago.
 

 Dr. Owens found additional non-lethal injuries, including significant bruising and abrasions at various stages of healing on the child's head and body. The child also had thirty-eight rib fractures that had been inflicted on at least three different occasions; some occurring around one or two months ago, others about one week ago, and one that was "more than likely less than a day or two" old. Most of the child's rib fractures were in "areas [that] are extremely difficult to fracture[.]" Dr. Owens testified that the nature of the child's fractures was "clearly
 
 *518
 
 indicative of pressure from fingertips when a child is held or squeezed during an episode of shaking."
 

 When asked what "a child experiencing these types of hemorrhages [would] feel," Dr. Owens testified that:
 

 [A] person who has experienced [this] type of trauma often becomes immediately noticeably more lethargic. They are not themselves. They are not responding as they normally would. They may still seem conscious, but they do not interact with the world around them in a normal fashion.
 

 So there would be less eye opening.... They're very quiet.
 

 Again, they may become completely unresponsive. There are some brain stem reflexes, like suckling, that could still occur, but the children don't usually feed normally. They don't actually take a whole bottle, you know, or actually swallow.
 

 At defendant's trial, the mother testified that she first noticed the child was not behaving normally on the morning of 26 October 2012, roughly a day-and-a-half before the child was pronounced dead. The night before, on 25 October 2012, the mother left the child alone in their hotel room with defendant. No one else was in the room with defendant and the child when the mother left and returned that evening. When the mother left the room, defendant had the child sitting on his lap. The mother came back about twenty minutes later and found the child lying on her stomach on the bed. The mother kissed the child, but the child did not respond and her eyes remained closed. The mother testified that she never put the child on her stomach because she would immediately start to cry, and that this was the first time that she had seen the child sleeping on her stomach. By the time the mother went to bed that evening, the child had not moved and was still sleeping.
 

 The mother awoke the next morning on 26 October 2012 around 9:45 a.m. The mother testified that she picked the child up and that the child's body was limp, explaining, "When I picked her up her head would go down and her body would just be weak," and that the child's head would fall forward. The child's eyes were still closed the morning of 26 October 2012, and the mother tried unsuccessfully to open the child's eyes several times throughout the day. She tried to feed the child four times on 26 October 2012, but the child only ate one-third of what she
 
 *519
 
 would normally eat. The child remained limp throughout the day on 26 October 2012, and did not make any noise or move on her own. Neither defendant nor the mother sought medical attention for the child on 26 October 2012. The mother testified that she "just thought [the child] was sick," and that when she told defendant that she thought the child was sick, defendant "didn't say anything."
 

 The mother left defendant and the child alone in the hotel room again on 26 October 2012 for about ten minutes around 7:00 p.m. The mother returned to find the child in the same position on the bed as when she had left. The mother asked defendant if he had shaken the child, and defendant indicated that he had not. The mother told defendant that if the child did not get better soon that she wanted to take the child to the doctor that night. Defendant did not respond, and they did not take the child to the doctor that evening.
 

 When the mother awoke on the morning of 27 October 2012, the child was in the same position as when she went to bed the night
 
 *892
 
 before. The child had made no noise overnight, and that day only ate one-third of what she would normally eat. The child's body was still limp, and she did not open her eyes. On the evening of 27 October 2012, the mother left the child with defendant alone in the hotel room around 6:00 p.m. for roughly ten minutes. The child had not moved when the mother came back. The mother left the child alone with defendant once more for ten minutes that evening around 7:50 p.m. The mother testified that the child was on top of the bed's comforter under a towel when the mother left, but was under the covers when the mother returned.
 

 About thirty minutes later, around 8:30 p.m. on 27 October 2012, the mother testified that she noticed the child was not breathing. Defendant checked and confirmed that the child was not breathing. The mother testified, "then I asked [defendant] can I call, can I call the paramedics. And he told me to wait till the next day." The following exchange took place on direct examination:
 

 Q. Was there any discussion about what to tell the police when you called them the next day?
 

 A. Yes, sir.
 

 Q. Okay. What-tell me about that discussion.
 

 A. He told me to tell them that [my other child] was holding her, and she dropped her.
 

 Q. And when he told you to tell the police that [your other daughter] dropped [her], what did you say?
 

 *520
 
 A. I didn't say anything.
 

 ...
 

 Q. How long did [this conversation] take?
 

 A. It took 20 minutes.
 

 ...
 

 Q. ... So what's being talked about during this 20 minutes?
 

 A. He's just telling me to wait till the next day. All this is going on in the same conversation. Telling me to wait till the next day. Tell them that [my other daughter] dropped her. And I'm just standing there listening to him. Then I asked him if I could use the phone to call the paramedics at this time.
 

 Q. And what did he say?
 

 A. He just gave me the phone.
 

 Q. And what did you do?
 

 A. I called the paramedics.
 

 The mother testified that she had never hit, thrown, or dropped the child, and had not caused any of her injuries. The mother also testified that she did not know how the child had received her fatal injuries. However, the mother said that she knew of at least one occasion a month earlier where defendant had left scars on the child's face. The mother did not witness that incident, but testified that right after it happened, defendant told her that he had put his hand over the child's mouth because she was crying. When she examined the child, she saw cuts on the child's face and blood on the child's pillow.
 

 Defendant was indicted for murder on 13 November 2012 and for felony child abuse on 20 May 2013. As explained in Section IV below, defendant was eventually found to have forfeited his right to court-appointed counsel. Defendant's jury trial began on 14 March 2016, and defendant represented himself with the assistance of standby counsel. The trial court declared a mistrial on 16 March 2016. The same day, the parties stipulated to defendant's waiver of his right to a jury trial and the trial court consented to conducting a bench trial. Judge Robert T. Sumner presided over defendant's bench trial and found defendant guilty of first-degree murder and felonious child abuse on 23 March 2016. Judge Sumner sentenced defendant to life without parole and a
 
 *521
 
 consecutive 110-144 months' imprisonment. Defendant entered oral notice of appeal in open court.
 

 On appeal, defendant argues (1) that the trial court erred in denying his motion to dismiss because the State's evidence was insufficient to support an inference that defendant inflicted the child's lethal injuries; (2) that the trial court was not authorized to hold a bench trial because the constitutional amendment allowing waiver of a jury trial did not go into effect until after defendant was arraigned; (3) that defendant's conduct did not rise to the egregious level supporting forfeiture of counsel, or in the alternative,
 
 *893
 
 that defendant's forfeiture should have been reconsidered in light of his changed conduct; and (4) that the trial court effectively denied defendant expert assistance when it denied his motion for a continuance.
 

 II. Waiver of Jury Trial
 

 As further discussed in Section IV below, defendant represented himself at trial. At trial, just before jury selection was about to begin, defendant requested that the trial court conduct a bench trial instead of a jury trial. Judge Sumner declined to hold a bench trial, stating that "a jury trial [is] a very fundamental right that is, in a case like this, almost absolutely necessary." During jury selection, however, one of the potential jurors abruptly announced that she had seen defendant in the newspaper and that he had robbed her boyfriend's home. Noting "the gasp [he] heard from the back and from the other jurors," the State concurred in a motion for a mistrial. Judge Sumner declared a mistrial, and at that point the possibility of a bench trial was revisited. In light of the mistrial and the "efforts the last several days to obtain a fair and impartial jury," Judge Sumner said that he would consent to a bench trial based on the written stipulation of both parties. The parties so stipulated, and defendant's bench trial began on 18 March 2016. Judge Sumner found defendant guilty of first-degree murder and felony child abuse.
 

 The trial court's authority to consent to the bench trial derived from a recent amendment to Article I, Section 24 of the North Carolina Constitution. However, defendant argues that the constitutional amendment permitting waiver of a jury trial only applies to defendants who are arraigned on or after 1 December 2014. Defendant was arraigned on 27 February 2014. Accordingly, defendant contends that the trial court was not permitted to consent to a bench trial and that, therefore, his convictions must be vacated. We agree.
 

 *522
 

 A. Discussion
 

 North Carolina has historically mandated trial by jury in all criminal cases.
 
 See
 
 N.C. Const. Art. I, § 24 (2014). "Unlike the right to a jury trial established by the Sixth Amendment of the U.S. Constitution, the right to a jury trial pursuant to Article I, Section 24" could not be waived.
 
 State v. Bunch
 
 ,
 
 196 N.C. App. 438
 
 , 440,
 
 675 S.E.2d 103
 
 , 104 (2009),
 
 affirmed
 
 ,
 
 363 N.C. 841
 
 ,
 
 689 S.E.2d 866
 
 (2010). However, on 4 November 2014, North Carolina voters approved a ballot measure to amend the North Carolina Constitution. The amendment allows criminal defendants in non-capital cases to waive their right to a jury trial and to opt instead for a bench trial. As amended, Article I, Section 24 of the North Carolina Constitution now provides:
 

 No person shall be convicted of any crime but by the unanimous verdict of a jury in open court, except that a person accused of any criminal offense for which the State is not seeking a sentence of death in superior court may, in writing or on the record in the court and with the consent of the trial judge, waive jury trial, subject to procedures prescribed by the General Assembly. The General Assembly may, however, provide for other means of trial for misdemeanors, with the right of appeal for trial
 
 de novo
 
 .
 

 N.C. Const. art. I, § 24 (2017). The original Session Laws that authorized the ballot measure provided that "[i]f the constitutional amendment ... is approved by the voters, [it] becomes effective December 1, 2014, and applies to criminal cases arraigned in superior court on or after that date."
 
 2013 N.C. Sess. Laws 300
 
 -399, § 5.
 

 The constitutional amendment was codified at N.C. Gen. Stat. § 15A-1201(b), which provides:
 

 A defendant accused of any criminal offense for which the State is not seeking a sentence of death in superior court may, knowingly and voluntarily, in writing or on the record in the court and with the consent of the trial judge, waive the right to trial by jury. When a defendant waives the right to trial by jury under this section, the jury is dispensed with as provided by law, and the whole matter of law and fact ... shall be heard and judgment given by the court.
 

 *894
 
 N.C. Gen. Stat. § 15A-1201(b) (2017).
 
 2015 N.C. Sess. Laws 289
 
 -215, § 1 subsequently amended N.C. Gen. Stat. § 15A-1201 to provide the
 
 *523
 
 procedures for a defendant's waiver of his right to a trial by jury. 2015 N.C. Sess. Laws. 289-215, § 1; N.C. Gen. Stat. § 15A-1201(c) - (f) (2015). The amended statute became effective on 1 October 2015. 2015 N.C. Sess. Laws. 289-215, § 4.
 

 Because § 15A-1201 was amended to include additional procedures for waiving the right to a jury trial, the State argues that the Article I, Section 24 amendment now applies to any defendant seeking to waive his right to a jury trial on or after the date that the
 
 statutory
 
 amendment went into effect: 1 October 2015, with the date of the defendant's arraignment no longer being of any relevance. However, the purpose of the statutory amendment was to supplement § 15A-1201 with additional procedures for a defendant's waiver of his right to trial by jury. That the new procedures for waiving the right to a jury trial went into effect on 1 October 2015 does not change the effective date of the constitutional amendment itself.
 
 See
 

 State v. Swink
 
 , --- N.C. App. ----, ----,
 
 797 S.E.2d 330
 
 , 332 (2017) ("The amended statute became effective on 1 December 2014 and applied 'to criminal cases arraigned in superior court on or after that date.' "). The official commentary to Section 15A-1201 reiterates this principle.
 
 See
 
 N.C. Gen. Stat. § 15A-1201 (Official Commentary) ("Session Laws 2013-300, s. 4, effective December 1, 2014, added 'waiver of jury trial' in the section heading; ... Session Laws 2015-289, s. 1, effective October 1, 2015, added 'procedure for waiver' in the section heading[.]"). Accordingly, a trial court may consent to a criminal defendant's waiver of his right to a jury trial only if the defendant was arraigned on or after 1 December 2014. However, if the defendant was arraigned prior to 1 December 2014, the pre-amendment version of Article I, Section 24 will govern his trial procedures-that is, the defendant may not be convicted "but by the unanimous verdict of a jury[.]" N.C. Const. art. I, § 24 (2014). This is the case despite the defendant's and the State's attempt to stipulate otherwise.
 
 See e.g.,
 

 State v. Hudson
 
 ,
 
 280 N.C. 74
 
 , 79,
 
 185 S.E.2d 189
 
 , 192 (1971).
 

 In the instant case, while there is no indication that defendant requested a formal arraignment pursuant to N.C. Gen. Stat. § 15A-941, he was indeed arraigned on 24 February 2014.
 
 [1]
 
 Therefore, because defendant was arraigned before 1 December 2014, he was not constitutionally permitted to waive his right to a trial by jury.
 

 *524
 

 B. Standard of Review to be Applied in the Instant Case
 

 We next address whether defendant's convictions must be vacated, or whether defendant must establish that he was prejudiced as a result of his waiver of a jury trial.
 

 Citing
 
 State v. Swink
 
 , the State argues that a "defendant would have to be able to show both that the trial court violated the statute and that such violation prejudiced him" in order for the defendant to be granted a new trial on the grounds that he was not permitted to waive his right to a jury trial under § 15A-1201.
 
 Swink
 
 , --- N.C. App. at ----,
 
 797 S.E.2d at 332
 
 . The State argues that defendant is not entitled to a new trial because he cannot show prejudice, while defendant argues that the "denial of the right to trial by jury of twelve is reviewed as structural error." Because the trial court's error in this case was a structural error, defendant maintains that "no showing of prejudice is required" for him to be entitled to a new trial.
 

 In
 
 Swink
 
 , the defendant was required to show that he was prejudiced by his waiver of a jury trial because the defendant was arraigned after 1 December 2014. Therefore, the defendant's right to a jury trial was no longer constitutional, but had instead become statutory.
 

 Id.
 

 at ----,
 
 797 S.E.2d at 333
 
 ("But the cases defendant cites involve fatal constitutional errors depriving the defendant of his or her constitutional right to a jury trial, rather than the intentional waiver of a statutory right to a jury trial, which is what is at issue here.") (citations omitted).
 

 *895
 
 In contrast to the defendant in
 
 Swink
 
 , at the time defendant was arraigned, amended Article I, Section 24 had not gone into effect and had not been codified. Thus, the error that defendant asserts on appeal regarding the waiver of his right to a jury trial is constitutional in nature, rather than statutory. The applicable version of Article I, Section 24 required that defendant not "be convicted of any crime but by the unanimous verdict of a jury in open court." N.C. Const. art. I, § 24 (2014). However, defendant was not convicted by the unanimous verdict of a jury. Where the error under the previous version of Article I, Section 24 involves a verdict that was rendered by an "improperly constituted" fact-finder-or in other words, anything less than twelve unanimous jurors-the error is said to be structural and automatic reversal is mandated.
 
 State v. Wilson
 
 ,
 
 192 N.C. App. 359
 
 , 368-69,
 
 665 S.E.2d 751
 
 , 756 (2008) (citing
 
 State v. Poindexter
 
 ,
 
 353 N.C. 440
 
 ,
 
 545 S.E.2d 414
 
 (2001) ;
 
 State v. Bunning
 
 ,
 
 346 N.C. 253
 
 ,
 
 485 S.E.2d 290
 
 (1997) ; and
 
 State v. Hudson
 
 ,
 
 280 N.C. 74
 
 ,
 
 185 S.E.2d 189
 
 (1971) ). Because the fact-finder in the present case was "improperly constituted" for purposes of
 
 *525
 
 N.C. Const. art. I, § 24 (2014) in that it consisted of a single trial judge rather than twelve unanimous jurors, "automatic reversal is required."
 
 Id.
 
 at 367,
 
 665 S.E.2d at 755
 
 . Despite the trial court's patient efforts to accommodate defendant, defendant is entitled to a new trial, by jury.
 

 III. Trial Court's Denial of Defendant's Motion to Dismiss and Motion for a Continuance
 

 Because we determine that defendant is entitled to a new trial for the above reasons, we need not address defendant's alternative argument that he is entitled to a new trial because he was effectively denied expert assistance when the trial court denied his motion for a continuance. Likewise, we do not address the trial court's denial of defendant's motion to dismiss for insufficient evidence.
 

 IV. Forfeiture of Counsel
 

 During the three and a half years leading up to his trial, defendant engaged in a consistent pattern of misconduct with regard to his court-appointed counsel. Misconduct of a certain degree will "justify a forfeiture of a defendant's right to counsel."
 
 State v. Blakeney
 
 ,
 
 245 N.C. App. 452
 
 , ----,
 
 782 S.E.2d 88
 
 , 94 (2016) (citation and quotation marks omitted). While there is no bright-line rule as to the particular behavior that will justify forfeiture, "forfeiture has generally been limited to situations involving 'severe misconduct[.]' "
 

 Id.
 

 This often involves situations in which the defendant engages in:
 

 (1) flagrant or extended delaying tactics, such as repeatedly firing a series of attorneys; (2) offensive or abusive behavior, such as threatening counsel, cursing, spitting, or disrupting proceedings in court; or (3) refusal to acknowledge the trial court's jurisdiction or participate in the judicial process, or insistence on nonsensical and nonexistent legal "rights."
 

 Id.
 

 In the instant case, defendant's behavior satisfied all of these categories: as the State points out, defendant "fir[ed] or threaten[ed] to fire three separate lawyers, call[ed] them liars, accus[ed] them of ethical violations, report[ed] one to the Bar, curs[ed] at one in open court, ha[d] to be forcibly brought into court, refus[ed] to meet with his attorneys, question[ed] the court's jurisdiction, refus[ed] to answer the court's inquiries, and [was] held in contempt. ..." After defendant refused to cooperate with, and attempted to fire, his third appointed attorney, the
 
 *526
 
 trial court found that defendant had forfeited his right to court-appointed counsel. The trial court appointed Calvin Coleman as standby counsel.
 

 On the first day of defendant's trial, and after the trial court had reconsidered the issue of counsel on two previous occasions, defendant insisted that he had finally come to understand the seriousness of the situation and asked Judge Sumner to appoint Mr. Coleman as his attorney, rather than as his standby counsel. Mr. Coleman did not object to the possibility, and told Judge Sumner that he had "seen a maturity over the last year or so" on the part of defendant. However, Mr. Coleman told the court that he would not be ready to go forward with trial that day if re-appointed. Judge Sumner denied the motion for counsel based on the prior forfeiture orders, reasoning that defendant had continued to show an "indifference ... to frustrate the orderly process of the trial."
 

 *896
 
 After defendant's mistrial was declared, Mr. Coleman asked that the prior forfeiture findings "be reconsidered based upon [defendant's] present actions." Judge Sumner declined to reconsider, stating that "There's no question in my mind that he's forfeited the right to counsel." Consequently, defendant represented himself at his bench trial, with Mr. Coleman assisting on a standby basis.
 

 On appeal, defendant contends (1) that his initial conduct did not rise to the egregious level warranting forfeiture of his constitutional right to court-appointed counsel, and (2) that the forfeiture orders should have been reconsidered in light of defendant's changed conduct. However, we do not address these arguments. For the reasons explained in Section II,
 
 supra
 
 , defendant is entitled to a new trial based on grounds wholly independent from forfeiture.
 

 Nonetheless, where a defendant is found to have forfeited his right to counsel, "a break in the period of forfeiture occur[s] when counsel [is] appointed to represent [the] [d]efendant on appeal following his initial conviction."
 
 State v. Boyd
 
 ,
 
 205 N.C. App. 450
 
 , 455,
 
 697 S.E.2d 392
 
 , 395 (2010). Because defendant accepted "the appointment of counsel on appeal following his ... trial and allow[ed] appointed counsel to represent him throughout the [present] appellate process[,]" the trial court's prior forfeiture determinations will not carry over to defendant's new trial.
 

 Id.
 

 at 455-56
 
 ,
 
 697 S.E.2d at 395
 
 . Thus, defendant's forfeiture ended with his first trial. If, going forward, defendant follows the same pattern of egregious behavior toward his new counsel, the trial court should conduct a fresh inquiry in order to determine whether that conduct supports a finding of forfeiture.
 

 *527
 

 V. Conclusion
 

 For the reasons expressed herein, defendant is entitled to a new trial, before a jury.
 

 NEW TRIAL.
 

 Judges CALABRIA and ARROWOOD concur.
 

 [1]
 

 After defendant was appointed standby counsel, the State stated, "Your Honor, [defendant] was on for arraignment today. If I may just go ahead and arraign him?" The trial court allowed, and the State read the arraignments and the indictment. Defendant stood mute and the trial court entered pleas of not guilty.